MARR *et al.* v. SHAW.

*(Circuit Court, D. Minnesota. 1892.)*

1. SPECIFIC PERFORMANCE—REQUISITES OF CONTRACT—EVIDENCE.
   Specific performance of an alleged oral contract to convey land, when the proof of such contract is vague, uncertain, and fragmentary, will not be enforced 20 years after the alleged date thereof, and when the relation of the parties and surrounding circumstances rebut the presumption of the existence of such contract.

2. SAME—WHEN DECREED—DISCRETION OF COURT.
   Specific performance of a contract for the sale of land rests in the discretion of the court, and will not be decreed when it would work a hardship or injustice to either party. The parties, in such a case, may be left to their remedies at law.

3. SAME—IMPROVEMENTS—EQUITIES.
   Defendant bought a farm in order to secure a home for her indigent brother and his family, taking the deed in her own name. He took possession, and lived thereon for many years, until his death, making some improvements, but in the mean time defendant advanced him money far exceeding the value thereof. *Held*, in a suit by his widow for specific performance of an alleged oral contract to sell the farm to deceased, that there was no equity arising in complainant's favor because of the improvements.

4. VENDOR AND PURCHASER—THE CONTRACT—PROPOSITION AND ACCEPTANCE.
   Where an offer of sale of land stands for 20 years, and until after the death of the party to whom it is made, without compliance with its terms, the widow and sole devisee of such party cannot accept the proposition, and offer to perform it, and thereby make a contract binding upon the proposer.

In Equity. Bill by Mary Jane Marr, and Mary Jane Marr as executrix of the estate of Dennis Washington Marr, deceased, against Charlotte R. Shaw, to enforce the specific performance of an oral contract to convey land. Bill dismissed.

*Ferguson & Kneeland*, for complainants.

*Young & Lightner*, for defendant.

Before SANBORN, Circuit Judge, and NELSON, District Judge.

SANBORN, Circuit Judge. · This is a suit in equity to enforce the specific performance of a contract to convey a tract of about 170 acres of land near the city of Minneapolis, brought by Mary Jane Marr, who

is the widow, sole devisee, and sole executrix of the last will of Dennis W. Marr, deceased. The bill alleges that on the 14th day of November, A. D. 1866, the defendant, who had just purchased the land for $6,200, made a contract with Dennis W. Marr, in consideration that he would enter upon, cultivate, and occupy the land, and pay the taxes thereon, that she would convey the same to him at any time he should pay her the said $6,200, and that in the mean time he should have all the produce and profits of the land and its cultivation; that Dennis W. Marr then agreed to purchase the land on these terms, paid her $200 of the purchase money, and on the 20th day of March, 1867, entered upon, and thereafter occupied and cultivated, the land, and paid the taxes upon it, until he died, on September 12, 1886, and that in the mean time he had made permanent improvements thereon. The answer denies that the defendant ever made any contract to sell the land to Mr. Marr, but avers that she bought it in 1866, to provide a place for him to earn his living and support his family, and agreed that he might go into the possession and use of it as her tenant at will, on condition that he should pay the taxes on the land, and keep the improvements in good repair. It also alleges that under this agreement he did enter upon the land in March, 1867, and occupied it until he died. It denies that he ever paid anything towards the purchase of the property, or made any permanent improvements: and alleges that between the date of her purchase of the land and his death the defendant had advanced to him more than $3,000, which he had never repaid.

In the consideration of this case it must be borne in mind that the entry upon, occupation, and use of this land by Mr. Marr, and the payment of the taxes thereon, were acts that both parties admit he agreed to and did perform. The complainant claims he performed them under his contract of purchase; the defendant, that he performed them under his contract of lease; hence the acts themselves, and their performance, do not strengthen the contention of either party. We must therefore look to other evidence to determine the only issue in this case, viz., whether the defendant made a contract of sale or a contract of lease with Marr in November, 1866, and to the contract thus established the occupation and use must be referred. This issue is strenuously contested, and the existence of any contract of sale rendered at least doubtful by the testimony of the witnesses. It therefore becomes important to notice the circumstances and situation of the contracting parties, and to consider the probability of the existence of this contract. As disclosed by the record, they were these: The defendant was the sister of Dennis W. Marr. She lived in New England, sometimes in Scarborough, Me., sometimes in Springfield, Mass. Mr. Marr, in and prior to 1857, lived in a house in St. Anthony, now Minneapolis, Minn., which he or his wife owned, but which was mortgaged for more than $2,000 to one Mayall. In 1857, Mr. Marr failed in business, and was ever after that insolvent, until in 1868 he took the benefit of the bankrupt act. In 1859 he was unable to pay the mortgage on the house he occupied, and to prevent its foreclosure, and to save himself and family, which consisted

of his wife and four young girls, from being turned out of doors, he besought the defendant to buy, and she did buy, this mortgage on his house, at an expense of $2,400, foreclosed it, and gave him the use and rent of the house and property from 1859 until he died in 1886, on the sole condition that he should pay the taxes, and keep the improvements in repair. In 1866, Mr. Marr, who was still living in this house of the defendant, and was very poor, besought a neighbor of his, who was going east, to go to the defendant in Maine, tell her of his extreme poverty, and beseech her to buy a piece of land and put him on it as her tenant, so that he could there earn a comfortable living for his family. This neighbor carried the message to the defendant, and in response she came from Maine to Minneapolis, in 1866, for the purpose of buying a farm, and putting her brother upon it as her tenant, so that he might there support his family, and educate his children. Immediately on her arrival she took pity on his poverty, and bought him a pair of horses, a wagon, and harness, for him to earn his living with during that winter. She then bought the land here in controversy, caused it to be conveyed to herself, paid $4,000 cash for it, and gave a mortgage back for $2,200, which she subsequently paid. In March, 1867, Mr. Marr and his family moved upon the farm in controversy, and he continued to occupy and cultivate it from that date until he died. For the horses, wagon, harness, and other purchases of personal property the defendant made for this brother, and in the expenses of her trip to Minnesota to assist him, she expended about $1,000 in the fall of 1866. In the spring and summer of 1867 she advanced $645 to enable him to plow and seed this farm, and buy machinery to operate it. In 1873, at his request, she intrusted him with $1,500, to buy 10 acres of land adjoining her farm, and to invest the balance in pine lands for her. He took the money, but never bought the 10 acres, never invested any of it in pine lands, and never accounted for or paid back any of all these moneys so advanced and intrusted to him, which amount to more than $3,000. About the year 1871, Mr. Marr grubbed and broke up about 30 acres of new land on this farm, and within two years after he received the $1,500 from the defendant to invest for her he built upon it a granary, machinery building, hennery, ice house, shingled the house and barn, moved an old building across the road and attached it to the house, enlarged the cellar, and built a new kitchen, so that the buildings were made more spacious, useful, and comfortable, at an expense of about $1,700; but no permanent improvements appear to have been made by him subsequent to 1875.

Under these circumstances, it is insisted by the complainant that in November, 1866, the defendant contracted orally to convey this farm to Marr for $6,200, whenever he was able to pay this sum. The witnesses most favorable to complainant, however, go no further than to testify that in conversation with Marr at the time of the purchase of the farm the defendant told him she was buying the place for him to make a home for himself and his family, and that the farm should be his at any time he could pay back what she had paid for it, and Mr.

Marr assented to this, and said he would do the best he could. No witness testifies that he told her he thought he could, or said to her he would, buy and pay for the farm; and all agree that he was to have the possession and use of it to support his family, for an indefinite time, whether he bought and paid for it or not. In view of this fact, and the further fact that the defendant furnished the money to buy the seed and machinery required in 1867 to raise the first crop, and that at Mr. Marr's request she came to Minnesota for the express purpose of buying a farm to put him on as her tenant, so that he might there support his family, then in great want, we are not satisfied that Mr. Marr, by his act of taking possession of the farm in the spring of 1867, either intended to or did agree to buy this farm, and pay the $6,200; and the entire evidence strongly points to the conclusion that he never made any such contract.

Specific performance of oral agreements to convey land, where the purchasers have entered under the contracts, and made permanent improvements upon the land, has long been enforced in equity, on the ground that a failure so to do would work a fraud on the purchasers through the loss of their improvements; but in the case at bar the reason of this rule ceases, because the entire improvements made by Mr. Marr were far less in cost and value than the money he received from the defendant after he took possession of the farm, and which he never repaid. No equity, therefore, in favor of the complainant arises here on account of these improvements. Complainant's witnesses seek to draw this contract, after a lapse of 22 years, from detached fragments of desultory conversations between defendant and Mr. Marr while she was visiting at his house on her errand of mercy in 1866, from family talk at meal times, and from subsequent admissions of hers to strangers that she had given Mr. Marr a chance to buy the farm by paying the original purchase price; but no witness testifies that Mr. Marr ever agreed with her to purchase, and pay this price; and, even if the defendant had offered to sell to him for $6,200 in 1866, such an unaccepted offer would surely be of no avail 20 years later, and after the death of Mr. Marr.

On the other hand, the answer of the defendant unqualifiedly denies this contract of sale that is sought to be culled from these fragmentary, desultory conversations. It is clearly proved that the purpose for which Mr. Marr besought the defendant to come to Minnesota in 1866, and the purpose for which she did come, was to buy a farm for him, to get a living on for himself and his family as her tenant; that both parties at that time sent for one B. F. Cutter to come to Minneapolis, to assist them in the purchase of such a farm; that he was present at Mr. Marr's house with them, advised and directed the negotiations while the purchase was being made, and remained until the negotiations were closed; and he testifies that the agreement was that Mr. Marr should occupy the farm, pay the taxes and insurance, keep the improvements in repair, and have all he could raise on the farm, and that there was no agreement to sell it to him. It is clearly proved that Mr. Marr, in his sched-

ules in bankruptcy in 1868, swore that he had no interest in any real estate under any contract; that in all his letters and writings that appear in evidence he mentioned this land as the defendant's farm, and never as his own; that in his lifetime he repeatedly asked the defendant to sell the farm to him, and she repeatedly refused; that to a cloud of witnesses he stated that the farm was hers, and to many that he was living on it as defendant's tenant under the arrangement set forth in the answer, and that he had no interest in it. It is clearly proved that the farm rapidly increased in value, until in 1883 it was worth $40,000, and that he never offered or attempted to pay the $6,200 for it, or to enforce his contract to buy it, but struggled on in despondency to his death. It is useless to further review this testimony. We are unable to believe that the defendant made any contract to sell this land to Marr for $6,200, or that he made any contract to purchase it.

Specific performance of an oral contract to convey land ought not to be decreed 20 years after the alleged date of the contract, unless the proof of the contract is full, clear, and satisfactory. *Purcell* v. *Miner*, 4 Wall. 513; *Colson* v. *Thompson*, 2 Wheat. 336; *Carr* v. *Duval*, 14 Pet. 84; *Lanz* v. *McLaughlin*, 14 Minn. 72, (Gil. 55;) Pom. Spec. Perf. § 136, and authorities there cited. In this case the proof of the contract is vague, uncertain, and fragmentary, while the surrounding circumstances, the situation, relation, acts, and statements of the parties to it while both were living, and for 19 years after its alleged date, make its existence improbable. It is incredible that a man of ordinary intelligence, with the right to purchase for $6,200 a farm that as early as 1883 was worth $40,000 should rest for years in silence and poverty without exercising his right, and die without attempting to enforce it. The proof of the contract is far from full, clear, or satisfactory.

Again, an offer of sale of land must be accepted in a reasonable time in order to bind the proposer, and one which stands for 20 years, and until after the death of the party to whom it is made, without compliance with its terms or any agreement to comply therewith on his part, is abandoned by the lapse of time, and its subsequent acceptance will not bind the proposer. Leake, Eq. Cont. 41; Pom. Spec. Perf. § 65; *Meynell* v. *Surtees*, 25 Law J. C. H. 257, 259; *Minnesota Linseed Oil Co.* v. *Collier White Lead Co.*, 4 Dill. 431.

Even if, as some of the witnesses testified, the defendant did tell Mr. Marr in 1866 that he could have the land by paying her the $6,200 she paid for it when he was able, inasmuch as he never did pay it, or agree to pay it, during the subsequent 19 years of his life, the complainant could not, after his death, accept the proposition, offer to perform it, and thereby make a contract binding upon the defendant.

Further, the specific performance of a contract in equity always rests in the sound discretion of the court, and where, upon a review of all the circumstances of the particular case, it is patent that it will produce hardship and injustice to either of the parties, they may be left to their remedies at law. In such a case a court of equity is not bound to render a decree of specific performance, even though the contract is es-

tablished. *Willard* v. *Tayloe*, 8 Wall. 557, 567; *Godwin* v. *Collins*, 3 Del. Ch. 189, 201, 205; *Joynes* v. *Stratham*, 3 Atk. 388; *Buxton* v. *Lister*, Id. 385; *Radcliffe* v. *Warrington*, 12 Ves. 326, 332; *Underwood* v. *Hitchcox*, 1 Ves. Sr. 279; *Seymour* v. *De Lancey*, 6 Johns. Ch. 222. For 27 years the sisterly affection and generous bounty of the defendant protected her unfortunate brother, his wife, who brings this suit, and their children, against poverty and misfortune. To her they were indebted for a house to live in, a farm, seed, horses, machinery, all things needful with which to secure from the fertile soil of Minnesota a comfortable living, education for their children, and a respectable station in society. To them for 27 years she gave all the income arising from the $2,400 she invested in 1859 at her brother's request, to save his family from being turned out of doors at St. Anthony, all of the income arising from the use of the investment of the $6,200 in the farm from the year 1866 to the present time, and the principal and interest of more than $3,000, which she advanced to her brother between 1866 and 1874. Neither misfortune, importunity, nor faithlessness seemed to cool her affection or exhaust her bounty. By her bounty this brother and his family were assisted until his death, his children have grown up and married, and his widow and devisee now asks this court to compel this defendant to perform a contract alleged to have been made 25 years ago, which, by its terms, would compel her, upon receipt of $6,200, which she put at risk in 1866 for her brother's comfort, to transfer to the complainant this farm, which has fortunately so increased in value that, if defendant may still hold it, it will be a fitting reward of her generosity. Such a contract would in itself be hard and inequitable under the circumstances of this case. The decree the complainants seek would be unjust to the defendant, and, if such a contract was clearly established, this court would hesitate long before it would award such a premium to ingratitude. The bill is dismissed.