## WAITE et al. v. O'NEIL et al.

### (Circuit Court, W. D. Tennessee. January 4, 1896.)

1. EQUITY JURISDICTION—WAIVER OF OBJECTION.

Failure to make, before final hearing, the objection of want of equitable jurisdiction because of an adequate remedy at law, is a waiver thereof, and authorizes the court to retain the cause, if the case be one of such a nature that equity might give the relief asked, or any part of it, or if the question of equitable jurisdiction be even a doubtful one.

2. SAME—ALTERNATIVE LEGAL RELIEF.

A decree embodying purely legal relief will more readily be granted by a court of equity, as alternative to the specific equitable relief prayed, when the objection of want of equitable jurisdiction is not taken until final hearing.

3. SAME.

Complainant filed a bill for specific performance of certain covenants in a lease, whereby, it was alleged, respondents became bound to repair and restore to its original condition the leased land, which had been undermined and partially washed away by a flood in the Mississippi river. In lieu of specific performance, the bill prayed for damages for breach of the covenant, and also for a decree for installments of rent due. *Held* that, while the court would deny specific performance, on the ground that the disaster to the premises was not in the contemplation of the parties, and the enforcement of the covenant would be unconscionable, yet there was such a show of equitable cognizance in the bill that the cause would be retained for the purpose of affording such other relief, even purely legal in character, as the proofs might justify.

4. LANDLORD AND TENANT—COVENANTS TO REPAIR—WASHING AWAY OF PREMISES ON RIVER BANK.

Where premises were leased for use as a river landing, with a covenant by the lessee to deliver up the premises at the end of the term in good order and condition, and to make good all damages thereto, except the usual wear and tear, *held* that, being construed in the light of the uses contemplated, the covenant merely bound the lessee to keep the premises in their usual condition of usefulness, as against ordinarily destructive influences operating to abrade the banks or displace the appliances used in the business, and that it did not bind him to restore the premises, after they had been undermined and partially washed away by an unusual flood, so powerful in its effects that vast expenditures, beyond the entire value of the premises, would have been necessary in order to stay the damage or restore the property to its original condition; but that, the lessee having abandoned the premises because they had been thus rendered unfit for the purposes of the lease, the owner was entitled to recover rent to the end of the term.

This was a bill by Charlotte H. Waite and others against J. N. O'Neil and others for a specific performance of the covenants of a lease, and for other relief.

The plaintiff, for herself, and as guardian for her children, executed to the defendants O'Neil & Co. a lease in the following words:

### "LEASE.

"Charlotte H. Waite, for herself, and as guardian of her two minor children, of the first party, and O'Neil & Co.,—firm composed of J. N. O'Neil, W. W. O'Neil, S. P. Large, and I. N. Large,—of the second party, hereby enter into the following contract, viz.: The said first party, by these presents, leases to the said second party, from the first day of November, 1882, until the first day of October, 1889, the river front and landing in front of lots numbers (1, 2, 3, and 4) one, two, three, and four, in block No. one (1) South Memphis, with ample space for a roadway along the landing at all stages of the water, and no more; the said landing to be used by said

lessees for the moving, storing, and unloading of coal, wood, and ice barges or boats, but not to be used as a dump for scavenger or night-soil wagons or carts. Said parties of the second part are to have the privilege of renewing this lease until the majority of the youngest of said minors, provided suitable arrangements can be made with the oldest child, who will then be of age. And the said first party covenants that she will keep and secure said second party in the peaceful use and possession of said premises during the term of this lease, unless default of payment of rent or other condition of this contract be made. The said second party, for and in consideration of the use of said premises, agree to pay to said first party, or her assigns, the sum of six thousand two hundred and twenty-five dollars, payable in eighty-three monthly installments, for which eighty-three promissory notes for twenty-five dollars each, of date hereof, have been executed; and the second party agree to deliver up, to said first party or her assigns, the said premises, at the expiration of this lease, in good order and condition, and to make good all damages to said premises, except the usual wear and proper use of the same, and to keep the roadway thereon in repair, and also to remain liable for rent until all the premises, with the keys of the same, clear of all persons, goods, or things not belonging to the same, be tendered or delivered to said first party, her heirs or assigns, in like good order; and no demand or notice of such delivery shall be necessary. The second party agree that they will not underlet the whole or any part of said premises without the written consent of said first party or her assigns. It is further agreed that, in default of either one or more of said payments, or any part thereof, at maturity, or in case of underletting without authority, this lease may be declared forfeited by said first party, at her option, in which case the second party shall be liable for all rents until the possession be delivered, and for all damages done to the premises; and the first party shall have the right to re-enter, take, and retain possession of said premises without being required to make demand of the same, or demand the payment of rent due, or to give notice of the nonpayment of the rent; and the first party shall not become a trespasser by taking possession as aforesaid. No set-off in payment of said rent shall be allowed, unless signed by the first party, her agent, or assigns, and the said notes shall be full and complete evidence of the rent due and owing, and when no notes are given, the proof of the payment of rent shall be on the second party in all controversies. It is agreed that said premises are in good order and condition at the date of these presents. In case of default of the second party, so as to forfeit this lease in their absence from this state, service of process upon any adult occupying or in possession of the premises shall be good and valid service upon the second party. It is further agreed by the party of the second part that they will, if necessary, construct, at their own expense, a roadway, with boats, piling, or plank, along the river front of said lots, and to construct the same without unnecessary digging of the ground on said lots, and to maintain the same during the continuance of this lease. This lease is to take effect upon the expiration of the lease held by Brown & Jones. Said second party stipulates not to commit, but to prevent, waste. It is further agreed that no alterations or repairs shall be done to any part of said premises by said second party, without the first party's consent, in writing, under the penalty of double the cost necessary to put the premises in the condition they were when leased to said second party; and the second party shall not, at any time, remove any permanent repairs, improvements, additions, or fixtures put on said premises. But the first party shall have and hold all of the same at the end of said lease. Said first party reserves the right to make such repairs at any time as are necessary to the security or preservation of said premises.

"In testimony whereof, the said parties have hereunto set their hands and affixed their seals, this 30th day of May, one thousand eight hundred and eighty-one. O'Neil & Co. [Seal.]
"Charlotte H. Waite. [Seal.]

"Witnesses:
    "Otto Seyppel.
    "C. A. Le Clerc."

About the 1st of May, 1886, the lessees abandoned the use of the premises, and refused to pay the rent, which is still due upon the 41 notes exhibited with the bill. The reason for this abandonment is found in the fact that, some time prior thereto, the banks of the river, through the operation of the currents, began to cave away, and in April, 1886, the extraordinary flood then prevailing swept out of existence a large part of these lots and their river front, as it did much of the adjacent property. This caving was so serious that it amounted almost to a public calamity, and demanded and received at the hands of the property owners and the government of the United States costly efforts to restrain the ravages, that resulted to some extent favorably. The government engineer, in charge of the work by which the caving was arrested, testifies that the cost of putting in the dikes, mattresses, and other work was about $64,000, the most of which was subscribed by the property owners. The lots of plaintiff lie on the upper portion of the banks that were injured, and the most of this expenditure was probably upon that portion of the banks lying below her lots; but, taking it as an entirety, there can be no doubt, on the proof, but that the work done under the supervision of the government arrested the destruction by the river, and, together with the operation of natural causes, has saved what is left. There is a dispute in the record as to the subsequent character of this landing, in respect of its adaptability to the uses of the lessees; but I think it may be taken, as established by the proof, substantially, that the landing has never been fit for any further use by the lessees since the destruction began. It is not impossible that they might have still used it during the term of the lease, by 'the expenditure of considerable sums of money; but, in the view that the court has taken of the case, it may be taken as a fact that the property conveyed by the lease was no longer available for the uses of the lessees. There is also a dispute in the proof as to whether or not the plaintiff agreed to contribute anything to a fund that was raised by the property holders to pay for the work which was done to arrest the ravages of the river, and counsel are disagreed as to the legal effect of such subscription, if any was made; but, again, it may be said that, in view of the rulings of the court upon the main issues of the case, this dispute of either fact or law is immaterial. The proof establishes, beyond controversy, that the destructive influences were beyond the control of a single property holder, and that the lessees could not, by the expenditure of any reasonable sum of money, have done anything to arrest the erosion caused by the currents of the river, which destroyed their property and that of the plaintiff in these premises. Work done alone in front of these lots that were leased would have been idle and useless. Any scheme to save them must have comprehended the whole front of the river, which was affected by the destructive influences which were at work to cause the caving of the banks. It must also be taken as proved that, all along, during the progress of the work, and up to the time when the proof was taken, the ultimate result was extremely doubtful as to the efficacy of the work to stop the destruction. It has turned out that the caving ceased, whether through the usefulness of the engineering work that was done, or from natural causes, or both, jointly, is not certain on the proof; but the important fact is shown that neither the owners of the property nor these lessees had anything more than a reasonable hope that the work would stop the caving of the banks, and it was under these circumstances that the lessees abandoned their holding, and refused to pay the rent. It is also proved that the lessor herself did nothing to arrest the progress of destruction, unless the disputed subscription to the fund by her can be taken as an effort in that direction.

The document constituting the lease between the parties shows that it was written upon the ordinary form of a lease of real estate, found, printed, at the stationers'; that some of the covenants therein are written into the blank form, and others are found in the printed portion which contains also some interlineation. After the date line, found in the opening clause of the lease, that which follows is written in down to the words, "And the said first party covenants that she will keep and secure the said second party in peaceful use and possession," etc. In the printed covenant for redelivery to the lessor in good condition, and to make good all damages to

said premises, except the usual wear and proper use of the same, and to keep the roadway thereon in repair, these last words about the roadway are written in. After the printed covenant for the service of process in the absence of the lessees, the covenant for the construction of the roadway at the expense of the lessees, and against unnecessary digging in the ground, is written in the blank form, down to the printed words of the covenant against alterations or repairs by the lessees without the consent of the lessor.

The bill was filed to enforce a specific performance of these covenants, or, in lieu thereof, damages for their nonperformance, for the collection of the rent not paid, and for general relief. The defendants make their answer a cross bill, as they may in the state court from which the case was removed, and pray a rescission of the lease and an injunction against the collection of the notes given for the rent. The case was not transferred after removal to the law side of the docket, nor was there any motion to replead for that purpose, nor any objection by defendants to the jurisdiction until the argument at the final hearing, nor did they offer to dismiss so much of their answer as was made a cross bill.

W. M. Randolph & Sons, for complainants.

Turley & Wright, for defendants.

HAMMOND, J. (after stating the facts as above). The troublesome question of the jurisdiction must be resolved in favor of the plaintiff. Notwithstanding the seemingly imperative command of the statute that a court shall, of its own motion, always dismiss a case where the want of jurisdiction appears, and notwithstanding the almost universal practice of the federal courts to so dispose of a case in its last stages, even after appeal in the supreme court, when the jurisdiction is lacking, it is quite well settled that this rule pertains more particularly to that class of cases where the jurisdiction is absolutely wanting, and the court could not, under any circumstances, have cognizance of that case; as, where there is not a diversity of citizenship, or there is not a subject-matter within our federal cognizance, or where statutes have been neglected which it was necessary strictly to follow in order to give the court that special jurisdiction conferred by them. In its relation to an objection taken under the Revised Statutes (section 723), prohibiting the jurisdiction of a court of equity where there is a plain, adequate, and complete remedy at law, the court will sometimes disregard the objection, if it be not taken in time, and does not always lend a ready ear when it is delayed until the final hearing. In this, as in any class of cases, the court will, even after appeal, dismiss, if it appear that a court of equity could not by any possibility acquire jurisdiction; but, if the question of jurisdiction be even doubtful, and the facts be of that nature that a court of equity might give the relief asked, or any part of it, the objection will be disregarded, unless it be made in limine. I do not know that I have found this better stated anywhere than in the case of Reynolds v. Watkins, 9 C. C. A. 273, 60 Fed. 824, by our own circuit court of appeals:

"An objection that the remedy at law was plain and adequate should be taken at the earliest opportunity. Yet neither consent nor negligence will confer jurisdiction in equity where none really exists, and the court may, at any stage of the cause, entertain such objection, or dismiss the bill mero motu. Yet there are cases where, if the objection of want of jurisdiction,

because of an adequate remedy at law, be not taken in the circuit court, and be for the first time presented upon appeal, the court will not feel itself obliged to entertain an objection coming so late, especially if the subject-matter of the suit is of a class over which a court of chancery has jurisdiction, and it is competent for the court to grant the relief sought."

The court cites for this position, Reynes v. Dumont, 130 U. S. 355, 9 Sup. Ct. 486; Kilbourn v. Sunderland, 130 U. S. 505, 9 Sup. Ct. 594. I have examined these and other cases, and, while I have found one only (Dederick v. Fox, 56 Fed. 714) where this rule was applied in the court of original jurisdiction, and they generally relate to an objection for the first time taken in the appellate court, there is, in principle and in practice, no difference in that regard. Indeed, the rule has been imported into the appellate courts from the high court of chancery and other courts of original cognizance, and the very authorities cited by the courts from the English practice refer to an objection which has been taken too late in the court of inferior jurisdiction; and I see no sound reason why a court of original jurisdiction should entertain the objection, when it has not been taken until the final hearing, any more than an appellate court should entertain it when it is made for the first time in that tribunal. At most, it is only a question of degree, and relates solely to the efflux of time; for the record is in precisely the same condition in the one court as in the other, the process of appeal having only transferred it from the one to the other, and, as it affects the rights of the parties, namely, the inconvenience and injustice to the plaintiff in having it made at so late a time, the rule of exclusion is just as forceful in the one case as in the other. The case of Preteca v. Land Grant Co., 1 C. C. A. 607, 50 Fed. 674, gathers the cases upon this point from both the state and federal courts somewhat extensively, and will save me the labor of citing them here. It quotes from Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, and Reynes v. Dumont, 130 U. S. 354, 9 Sup. Ct. 486, what is there said upon the subject of taking the objection to the jurisdiction at too late a stage of the proceedings. In Reynes v. Dumont, supra, the chief justice quotes from Daniell's Chancery Practice the rule that the objection must be taken at the earliest opportunity, and before the defendant answers and submits to the jurisdiction, and it will not be then heard, except in that class of cases where it is not open to any doubt that the bill brings into a court of equity matters absolutely cognizable only in a court of law. In Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, Mr. Justice Blatchford reaffirms Reynes v. Dumont, on this point, and cites a number of later cases, which is done also in Foltz v. Railway Co., 8 C. C. A. 635, 60 Fed. 316.

A careful examination of these cases, and of the other authorities for the practice, establishes the principle that, while a failure to make the objection that there is a want of equitable jurisdiction and an adequate remedy at law cannot impose upon the court of equity jurisdiction of matters that are purely of legal cognizance, the objection is waived by a failure to take it at the earliest opportunity in all that class of cases where it is possible for a court of equity to act in the premises. And in our federal practice we must

not confound the inflexible and inexorable rule, both statutory and judicial, that the federal courts will always decline jurisdiction at all stages of the case where it is absolutely wanting, and without the federal power, with the untenable position that a court of equity must always decline, at any stage of the proceedings, to take jurisdiction of a bill which it might have dismissed upon demurrer or plea, because the plaintiff might have had relief at law. There are some cases, even in the federal courts, where the objection to the jurisdiction may be waived by not taking it in time, and this seems one of them. Brown v. Iron Co., 134 U. S. 530, 10 Sup. Ct. 604; Hollins v. Coal & Iron Co., 150 U. S. 371, 380, 14 Sup. Ct. 127. However, it is not necessary for the plaintiff to rely on this waiver to save the jurisdiction here; and, somewhat oddly, it does not relieve us of the necessity of considering the merits of the objection to the jurisdiction. The rule is not absolute that the court will disregard the objection, either in the appellate court or here, simply for the reason that it is made for the first time at the final hearing or on appeal. Mr. Daniell calls attention to the danger of overlooking the qualification of the rule of waiver because the objection had not been taken in limine,—that it must nevertheless be always competent for a court of equity to grant relief, and it must have jurisdiction of the subject-matter. 1 Daniell, Ch. Prac. 555.

We must, therefore, see whether or not the case falls within that class which may be at all entertained by a court of equity. In determining this question, the court will be more complacent and indulgent of doubtful cases of equitable jurisdiction, when the objection is taken for the first time at the final hearing, than it would be if taken at the threshold; but, at last, the court must find some sensible ground for equitable procedure, or it will not proceed at all, no matter when the objection be taken. Allen v. Car Co., 139 U. S. 658, 11 Sup. Ct. 682. Also, the court will, when the objection to the jurisdiction has not been taken in due time, more readily grant a purely legal judgment as alternative to the relief in equity which it may deny. Yet, always, as before, there must be a fair and reasonable ground—or what I may, by a borrowed analogy, call "probable cause"—for his appeal to a court of equity. He must have had, in the nature of his case, a reasonable expectation of equitable relief, which has been disappointed only because that relief has been, in the legal discretion of the court, denied to him. This is very closely allied to the question, which has been so much argued in this case, whether or not this bill for specific performance is one which a court of equity should, within its discretion upon that subject, entertain. It is not a matter of course that a court of equity will always specifically perform a contract, or entertain a bill for that purpose, even where the plaintiff does not have an adequate remedy at law. Adequate or inadequate, courts of equity often compel the plaintiff to resort to his remedy at law, and, in the exercise of a legal discretion in that behalf, refuse the prayer for specific performance of the contract; and that is what we have been asked to do in this case. It will be observed that the two considerations just mentioned are not precisely the same,

and yet are so closely allied that we may treat them together; for, if this case be one in which the court would exercise its judicial discretion in favor of a specific performance, there would be no doubt of the jurisdiction. But, even though the court should deny a specific performance of the contract, in the exercise of that judicial discretion which it has in all cases asking that particular relief, yet, if the facts be such that the plaintiff might fairly and reasonably have expected the court to grant the equitable relief of specific performance, there would be such a show of equitable cognizance and doubtful remedy and probable cause as would save the plaintiff from the penalty of a dismissal of the bill for want of jurisdiction because of a plain, adequate, and complete remedy at law, under Rev. St. § 723. It might be that the court would refuse the prayer for specific performance, but, under the prayer for general relief, or some more specific prayer, give a decree which would be identical with a judgment that might have been obtained at law, no matter at what time the objection to the jurisdiction has been made, whether by demurrer or at the final hearing. But, certainly, if the case be of a doubtful kind, it should not be dismissed for want of jurisdiction, under section 723, supra, when the objection to the jurisdiction is taken only at the final hearing. In other words, if this bill be of that class often appearing, whether for specific performance or what not, in which a court of equity might maintain and grant relief as at law, although denying the equitable relief which has been prayed, the rule that the case would be dismissed because there was an adequate and complete remedy at law would not apply, unless it were taken at the earliest opportunity.

We shall, therefore, necessarily have to consider the objection which has been made that this case is not one falling within the class of cases in which a court of equity, while refusing the specific relief demanded by the bill, may grant some other relief which might have been obtained at law. In the case of Thompson v. Railroad Co., 6 Wall. 136, the court held that the case was bare of every pretense of equitable cognizance, and dismissed the bill, saying that it did not present a single element for equitable jurisdiction and relief, and that it was nothing but an ordinary action at law; and so it was in U. S. v. Wilson, 118 U. S. 86, 6 Sup. Ct. 991, where it was called an "ejectment brought in equity." But, in our Tennessee practice, it is well established that almost pure ejectment suits may be maintained in equity, upon the consideration that, "when parties have, at great expense, prepared a case for trial, they shall not be turned out of court upon a doubtful question of jurisdiction," and the case is held often upon a very slender thread of semblance of the jurisdiction. Buck v. Williams, 10 Heisk. 277; Almony v. Hicks, 3 Head, 39; Manufacturing Co. v. Ross, 12 Lea, 8. These cases go further, possibly, than the federal adjudications would warrant; but, still, these latter hold firmly to the jurisdiction, if no objection has been raised in early time, whenever there is a possibility of doing it without a violent invasion of the exclusive jurisdiction of a court of law. The case of Hayward v. Andrews, 106 U. S. 672, 1 Sup.

Ct. 544, where the jurisdiction was declined, is instructive; but there was not, there, even a fair pretense of equitable cognizance, as in Thompson v. Railroad Co., supra,—the assignee of a chose in action being not at all embarrassed at law, merely because he could not sue in his own name, when he might sue in the name of his assignor. And in Van Norden v. Morton, 99 U. S. 378, like Hurt v. Hollingsworth, 100 U. S. 100, the blending of legal and equitable remedies in federal courts, after the manner of the state courts, under the influence of state statutes, was condemned, as in this leading case of Thompson v. Railroad Co., so much urged by counsel for defendants here. I have traced that case, by the citations of it, quite carefully; and I think it may be said, of all of the type to which it belongs, that the jurisdiction was never declined unless there was a stripping to the bone of pure legal cognizance and of every delusive pretense of equitable cognizance relied on in the particular facts of each case. And wherever this process did not expose, in the bone, a case of pure and untinged legal jurisdiction, the equitable power to deal with it was maintained, even when the objection was properly made in limine; and it is not at all tolerated when made later, if there be no such nakedness of equitable jurisdiction. Mr. Circuit Judge Baxter, in Burdell v. Comstock, 15 Fed. 395, ousted the bill because it was a fraudulent pretext only; and in Re Sawyer, 124 U. S. 210, 8 Sup. Ct. 482, the supreme court, in a peculiar case, arising out of an attempt to stay by injunction what the majority of the judges thought to be criminal proceedings, enforced the fundamental idea that the court must always have at least a semblance of equitable cognizance, but the dissenting judges protested that even in such cases as presented an entire absence of this, the decree granting equitable relief was not void, under the rule that the judgment of a court without jurisdiction is void,—which shows that, under the statute excluding cases where there is a plain and adequate remedy at law, the court still may entertain those where the remedy is doubtful, and if the doubt is resolved against the equitable relief, the court may, nevertheless, having acquired the jurisdiction to resolve the doubt, give a legal relief rather than dismiss the bill, but, always, there must be a reasonable expectation of equitable relief in the first instance. In Hipp v. Babin, 19 How. 271, so much cited everywhere, as in the other cases, there was an entire absence of any reasonable pretense of equitable jurisdiction.

The cases sustaining the jurisdiction have been somewhat cited already, and it is quite certain that this case comes within the class they establish, if they are carefully considered in this connection; and these require that the court shall grant any relief, either equitable or legal, to which the plaintiff may be entitled, whenever the facts bring it within the rule we have stated. One of the earliest cases considering this statute is Boyce v. Grundy, 3 Pet. 210, where it is said not to bar a bill unless the remedy at law is "as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity." The leading case of Watson v. Sutherland, 5 Wall. 74, is called in Van Norden v. Morton, supra, "a close

case"; but, like Boyce v. Grundy, it well illustrates the extent to which a court of equity will go in maintaining a bill to avoid a multiplicity of suits, and the accumulation of damages recoverable at law, where the injury being done is cumulative and consequential, and therefore not adequately compensated by legal judgment. A pertinent illustration is found in Pennsylvania R. Co. v. St. Louis, A. & T. H. R. Co., 118 U. S. 290, 298, 6 Sup. Ct. 1094, which was a bill for the specific performance of the covenants of a long lease; and the very multiplicity of suits for rent installments is noted as a ground of equitable retention of a bill, when the issue of the obligation involves other complex issues, arising out of the claim for a compliance with the covenants of the lease and damages for their breach. And in Mobile Co. v. Kimball, 102 U. S. 691, the obstacle to a specific performance arising out of a repeal of the law authorizing a certain board to act, it was held that a court of equity would, after that, give pecuniary compensation in damages, and that it is the general rule that, if specific performance cannot be decreed because of such changes in conditions as produce obstacles to carrying out the contract, a court of equity, having jurisdiction to hear the plaintiff's demand for a specific performance, which must be refused, or which cannot be had, will grant any legal relief to which he may be entitled. And in a more notable case, that of Gormley v. Clark, 134 U. S. 338, 10 Sup. Ct. 554, even state legislation creating new equitable remedies was allowed to furnish a foundation for invoking the aid of a federal court of equity, and administering therein purely legal and somewhat anomalous relief; and this, notwithstanding the rulings subsequently made in Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276, and Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712. The chief justice truly says it is only cases which are "a mere pretext for bringing into chancery causes proper for a court of law" that are rejected, because the remedy at law is adequate. And in Root v. Woolworth, 150 U. S. 401, 14 Sup. Ct. 136, the objection of adequacy of remedy at law was held untenable, where the sole right to be in equity was to enforce a previous decree of an equity court settling the title. And so it is, wherever we find the cases, that the court retains the jurisdiction wherever there is a plausible ground of equitable cognizance, as against the objection arising too late, and even, in most cases, coming at any time.

Having, then, jurisdiction of this case, the question is, what relief, if any, can the plaintiff have here? Certainly she is entitled to a judgment on the rent notes in any event, and that is decreed; and somewhat reluctantly I conclude that she is entitled to nothing more. I say this because it does not seem to me the defendants acted towards the plaintiff with the highest regard for the contract when, abandoning it as they did, and refusing even to pay the rent, they did nothing whatever to save the property from the elements attacking it,—not even trying to mitigate the destruction, as in some degree they were bound to do. But, after all, they could not have saved it, and all they could have done, within the limits of their liability, was to keep it tenable for their uses somewhat longer than

they did.   But this injury finds full compensation in the payment of the rent during that time.   For the rent subsequently accruing they are liable on another ground, as we shall presently see.   It seems to me that this lease has been considered with too much disregard of its surrounding circumstances, and the character of the property about which the parties were dealing.   Mr. Justice Story said, in Van Ness v. Washington, 4 Pet. 232, that a court should not defeat the legal meaning, and resort to conjectural intents, but construe a solemn instrument according to the legal import of its terms. But the same learned judge said, also, in U. S. v. Appleton, 1 Sumn. 500, Fed. Cas. No. 14,463, that, in the construction of grants, the court ought to take into consideration the circumstances attendant upon the transaction, the particular situation of the parties, and the state of the thing granted, and that every grant of a thing necessarily imports a grant of it as it actually exists, unless the contrary is provided for; and this is the obvious rule of construction for all the purposes of justice between the parties.   So looking at this contract of lease, and it is not a grant of an estate in this land "from the zenith to the nadir," as the books put it, with all the formidable results of such an estate, and its uses, although the contract appropriates the forms of covenant usual in such leases.   It is a contract for the limited use of a part of a lot having the riparian right of wharfage or landing for vessels engaged in navigation and commerce; and it is in the light of this use we must scrutinize these covenants.   I do not doubt that the technical effect was to convey a leasehold estate in the land, and such was the intention of the parties; but it had reference to this particular use, and was more a contract for an occupation, sometimes termed a "franchise," than a seisin of the land.   East Haven v. Hemingway, 7 Conn. 202; Potomac Steam-Boat Co. v. Upper P. Steam-Boat Co., 109 U. S. 685, 3 Sup. Ct. 445, and 4 Sup. Ct. 15; Linthicum v. Ray, 9 Wall. 241. And it is in regard to this contemplated use of the thing granted that we are to find the intention of the parties in making these covenants.   Now, then, placing ourselves where the parties were, making this contract, and looking at it in relation to its surroundings, it seems monstrous to hold that these lessees intended to incur, or the lessor intended to bind them to an obligation which, if enforced according to the strict construction of the words which this demand upon them implies, would require an expenditure of moneys far in excess, not only of the value of the thing granted, but of the whole land to which that thing was appurtenant; for the proof shows that the ravages of the river could not have been stopped, if at all, without enormous sums of money used for the purpose, and we would have to hold that such a bargain was made when the parties knew—what we all know, and see every day—that this gigantic river, in its destructive influences, is uncontrollable, even when the vast resources of the government are yearly employed in the attempt to mitigate them.   Either the parties did not intend to impose this burden on the lessees, or it is so hard and unconscionable a bargain that a court of equity, exercising its ever present discre-

tion in applications for specific performance, will not enforce it. I do not think the parties intended anything more than that the lessees should keep the landing in such repair and condition of usefulness as was required for the uses to which they were to put it, and as it was then held, as against ordinarily destructive influences operating to abrade the banks or displace the appliances serving that use. A similar demand which was refused, was made upon a landlord upon supposed implied covenants to protect the tenant against the catastrophe of a snow slide which injured her, destroyed the property, and killed six of her children. Doyle v. Railroad Co., 147 U. S. 413, 422, 13 Sup. Ct. 333. It does not seem to me that the landlord has any better claim than that against a tenant for compensation for destruction that comes, without his fault, from external forces, such as storms, floods, earthquakes, and the like, in the absence of an express warranty, in the sense that the very words are used in the contract to make it express and clear, and not in the sense of being implied from other expressed words in the covenants, however broad, which may be made to stretch over such an injury by expansion of construction. Chancellor Walworth tells us that it was a law of Sesostris, an Egyptian king, that, if the violence of the river should wash away a part of the land, the tenant should be proportionately abated in his rent; but I do not find it anywhere adjudged, as the result of the ordinary covenants on either side, that either party to a lease shall be liable in damages to the other for the results, direct or consequential, of such destruction. Where it can be done reasonably within the power of ordinary business operations, either party may under such covenants be, and often they are, required to repair and restore and rebuild, or pay the cost of doing these things, and often very hard bargains are so enforced; but these demands fall within the ordinary description of injury that is in a sense reparable, and not to the re-creation of things that have been utterly destroyed, as land that is swept away by flood, as this was. In the absence of an express covenant to the contrary, such losses fall on the owners, each according to his holding; to the lessor or landlord that which he has owned, and to the lessee or tenant that which he has used. Tayl. Landl. & Ten. §§ 329, 347, 360, 373, 386.

On the other hand, the tenant must always pay the rent under such circumstances. Viterbo v. Friedlander, 120 U. S. 707, 712, 7 Sup. Ct. 962. There was, for a long time, a great struggle to break away from this seemingly harsh rule, and introduce, as an equity, a reduction or abatement of the rent when the property was destroyed. No less a personage than Mr. Justice Story urged it as counsel in one of the cases cited below, and was told by the bench that the contention had been finally overthrown. Chancellor Kent states the same thing in his text, and it is now well understood to be as Mr. Justice Gray states it in the case last cited. Mr. Taylor, in his work on Landlord and Tenant, so often quoted and commended in the highest places, seems to approve the discarded suggestion of an equitable abatement "where a part of the land is lost

to the tenant by the act of God," and states that he is not liable for the whole rent, "as where the sea break in and overflow a part of the land." He cites for this the ancient Case of Richards le Taverner, Dyer, 56a, and Rolle, Abr. p. 236, pl. 1; but, on subsequent consideration, the courts became thoroughly hostile to this view, at least so far as it relates to that kind of loss for which the tenant is in no sense himself responsible. 3 Kent, Comm. 465; Belfour v. Weston, 1 Term R. 310; Ellis v. Sandham, Id. 710; Hallett v. Wylie, 3 Johns. 44; Fowler v. Bott, 6 Mass. 63; Viterbo v. Friedlander, supra. What is said in the case of The Tornado, 108 U. S. 342, 351, 2 Sup. Ct. 746, does not apply where a lease has become executed, and has created an estate in the land for a term of years, as the foregoing authorities all show. The case of the music hall (Taylor v. Caldwell, 3 Best & S. 826), cited by Mr. Justice Blatchford, as it is by counsel here, was not a lease of the music hall, but only an agreement to let it, which makes a vast difference in the matter of a defense against the covenant to pay rent. In such an agreement it is open to a court of equity, as in other contracts, to apply the rule that the impossibility of performance, where it depends on the continued existence of a thing, is excused if the thing perish. Id. But a leasehold estate in land is an exception to this rule, as the cases cited establish. Tayl. Landl. & Ten. § 37.

But, moreover, as before stated, a court of equity will not specifically enforce such hard bargains, even where there is an express covenant. Tayl. Landl. & Ten. § 268. Therefore, if the defendants here had covenanted in the use of this landing to indemnify the plaintiff against all loss by flood or currents, and it came about that the loss was so enormous as to destroy the whole ground, river landing and all, so that a restoration was impossible, and the money it would have taken to stop the destruction was so out of proportion to the value of the thing leased as to make it unconscionable, a court of equity would, in its discretion, refuse specific performance. Hardness of bargain alone will not suffice to stay the hand of a court of equity, and it was so decreed in the case of a lease of telegraph wires where the rent money was inadequate. Telegraph Co. v. Harrison, 145 U. S. 459, 471, 12 Sup. Ct. 900. But it was refused where the circumstances showed that it was unconscionable to compel a man to comply with a contract that was oppressive. Manufacturing Co. v. Gormully, 144 U. S. 224, 237, 12 Sup. Ct. 632. And in another case, where it was refused because the proof was doubtful, the rule is stated that, while the discretion to withhold relief is not to be exercised capriciously or arbitrarily, but according to settled principles, it must always be done with reference to the facts of the particular case. Hennessey v. Woolworth, 128 U. S. 439, 9 Sup. Ct. 109; Nickerson v. Nickerson, 127 U. S. 668, 8 Sup. Ct. 1355; Cheney v. Libby, 134 U. S. 68, 78, 10 Sup. Ct. 498. In Dalzell v. Manufacturing Co., 149 U. S. 325, 13 Sup. Ct. 886, the court quotes approvingly Lord Hardwicke's rule that the contract must be "certain, fair, and just in all its parts." In the case of Railroad Co. v. Cromwell, 91 U. S. 643, Mr. Justice

Bradley said the court would not shut its eyes to the evident character of the transaction. In Marr v. Shaw, 51 Fed. 860, it is said that "where, upon a review of all the circumstances of the case, it is patent that it will produce hardship or injustice to either of the parties," specific performance will be refused. And in Pullman Palace Car Co. v. Texas & P. R. Co., 11 Fed. 625, specific performance was refused because the contract was unconscionable as against the public. All these cases cite the leading case of Willard v. Tayloe, 8 Wall. 557, so much relied on here, where the contract was decreed to be performed upon conditions which provided against its inequitable features, which is impossible in this case. Mr. Story sums up the result by saying that "courts of equity will not decree specific performance, except in cases where it would be strictly equitable to make such a decree"; and Mr. Pomeroy, by saying that, "if the contract is unfair, one-sided, unjust, unconscionable, or affected by any other inequitable feature, or its enforcement would be oppressive or hard on the defendant, * * * or, would work any injustice, * · * * its specific performance will be refused." 1 Story, Eq. Jur. § 750; 3 Pom. Eq. Jur. § 1405. It must be conceded that any court charged with such a wide discretion must look carefully to the legal principles that control it, and relieve it of all arbitrariness and capriciousness, lest we descend into a mere substitution of irregular and desultory judgment for that which is guided by "the established doctrine and settled principles of equity," as mentioned by Mr. Justice Bradley in Willard v. Tayloe, 8 Wall. 567. But, on the preceding page, he cites approvingly Lord Hardwicke's judgment, which refused to compel a tenant, under a covenant to repair, to pull down and rebuild houses which did not comply with the covenant. London v. Nash, 1 Ves. Sr. 12.

It was not, in my judgment, within the contemplation of the parties, or either of them, to provide by the covenants of this lease against the calamity that came upon this lessor and lessee by the extraordinary and unprecedented destruction of the banks of the river in front of this city,—a violence of nature which at one time threatened to carry away a considerable portion of the city itself, by undermining its foundations and establishing the channels of the river where streets and houses had been, which thing has been done before under our eyes in front of this very city, where the ground for the houses and streets is now again restored after years of submersion. The unconscionable character of the demand does not arise out of the covenants themselves, but out of the construction that is now put upon them, and the demand for damages for the not doing of things which it is not certain would have stopped the ravages if they had been done; and this, in lieu of a specific performance which might not have been decreed if the covenants for it had existed. If the very demand now made had been expressed in the words of the covenant, under the principles and cases cited, it would be inequitable to grant it and it would be refused. We have seen how the courts have struggled against

the attempt to introduce hardship as an equitable relief in favor of the lessee, as against the lessor's demand for rent, when the property has been partially or wholly destroyed without his fault. Surely, a court of equity will not superadd to the burden of the rent that of damages and compensation for the value of the property, upon either improvident covenants so binding him, or by implication upon words not expressing that especial and particular obligation; certainly not, if it have any discretion in the matter.

Decree for the rent and interest, with reference to fix amount, if necessary.