WAITE et al. v. O'NEIL et al

(Circuit Court of Appeals, Sixth Circuit.    October 5, 1896.)

No. 416:

1: EQUITY JURISDICTION—LEGAL RELIEF.

Complainant filed a bill for specific performance of covenants in a lease whereby, it was alleged, respondents became bound to restore part of the leased land, which was washed away by a flood in the Mississippi river. In lieu of specific performance the bill prayed for damages for breach of the covenant, and also for a decree for installments of rent due.    *Held* that, though specific performance was refused, there was such a showing of equitable cognizance that the cause should be retained for the purpose of affording other relief, even purely legal in character, if justified by the proofs.    72 Fed. 348, affirmed.

2: SAME—OBJECTIONS TO JURISDICTION—LACHES.

If the bill be such that a court of equity may maintain and grant relief as at law, though denying the equitable relief prayed for, the case will not be dismissed because there is an adequate and complete remedy at law unless the objection is taken at the earliest opportunity.

3. COVENANTS IN LEASE—IMPOSSIBILITY OF PERFORMANCE.

Plaintiff owned property extending 150 feet from a street to the Mississippi river, the property being mostly on a bluff 60 feet above low-water mark, but a strip in the rear at the foot of the bluff being at times covered by water.    The lease covered the river front and landing thereon. An unusual flood, caused by the giving way of government works further up the river, washed away this strip and so much of the bluff as to reduce the depth of plaintiff's property to from 15 to 30 feet.    The property could have been protected against the flood only by a comprehensive system of diking, extending a distance of about 10 times the length of plaintiff's shore line.    *Held*, that plaintiff was not entitled to specific performance of covenants by the lessee to keep the roadway leading to the landing in repair, and to deliver up the premises "in good order and repair."

4. SAME—RESTORING DAMAGED PROPERTY.

The lease in terms covered "the river front and landing in front of lots Nos. 1, 2, 3, and 4, block 1, South Memphis, with ample space for a roadway along the landing at all stages of the water, and no more"; the leased premises "to be used by the lessee for mooring, storing, loading, and unloading coal, wood, and ice barges or boats."    *Held*, that by covenants to deliver up the premises in good order and condition, and to keep the roadway along the landing in good repair, the lessees did not undertake to protect the lessor's land against injury caused by a sudden change of the currents of the river, of an extraordinary character.

5. SAME.

A provision of the lease prohibiting alterations or repairs to the premises without the consent in writing of the lessor, and reserving to the latter the right to make such repairs as should be necessary to the security or preservation of the premises, was sufficient to relieve the lessee from liability for failure to build protective works.

6. LIABILITY FOR RENT—DESTRUCTION OF PREMISES.

Where a "landing" which is the subject of a lease is destroyed by the ravages of the water, the shore line being moved back so that the bank of the river, as it exists after the caving away of the land has been arrested, is a vertical bluff, from 60 to 80 feet high, there is such a destruction of the premises as to exempt the lessee from liability for rent.

7. SAME—EVICTION.

The fact that in a lease of a landing the lessor reserves the right to make such repairs as shall be necessary towards the security and preservation of the premises does not give her the right to construct works in the river to protect her property which would make the use of the landing perilous and useless to the lessees, and such conduct will amount to an eviction.

Cross Appeal from the Circuit Court of the United States for the Western Division of the Western District of Tennessee.

This is a bill in equity to enforce the specific performance of certain covenants in a lease, and for the collection of rents in arrear. The suit was begun in 1886 by a bill filed by the complainant, as lessor, in the chancery court of the state, at Memphis, Tenn., and was subsequently removed to the circuit court of the United States by the complainant upon the ground that the defendants were all citizens of a state other than Tennessee. After removal the cause was docketed and tried as an equity suit. A motion made upon final hearing by the complainant to have the suit transferred to the law docket, and for a reformation of the pleadings, was disallowed. The subject-matter of the lease is described as "the river front and landing in front of lots number 1, 2, 3, and 4 in block 1, South Memphis, with ample space for a roadway along the landing in all stages of the water, and no more. The said landing to be used by the said lessees for the mooring, storing, and unloading of coal, wood, and ice barges or boats." The lease began November 1, 1882. and was to continue until October 1, 1889. Eighty-three notes for $75 each were executed, one being payable each month during continuance of the lease. The rent notes, up to and including that due April 1, 1886, were paid at maturity. The notes falling due in May, June, July, and August, 1886, were due and unpaid when the bill was filed. The subsequent installments of rent fell due pending the suit, and, by a supplemental bill filed after expiration of the lease, relief was sought upon them. The prayer of the bill was for a specific performance of certain covenants touching the repair and construction and preservation of the roadway mentioned in the lease, and for an account for waste resulting from the caving in of the bank of the river at the landing, and for a decree for rents past due. The defendants abandoned the premises in April, 1886, claiming that the "landing" referred to in the lease had been destroyed without their fault, and the lease thereby terminated. They further claimed that all possibility of beneficially using the said landing, if otherwise available, was destroyed by the conduct of the lessor in aiding and abetting in the obstruction of access to the lessor's remaining river front by the construction of certain sunken dikes, extending from the shore perpendicularly for several hundred feet, and effectually preventing barges from being safely brought to the shore line. Touching these defenses it is necessary to state certain other facts. The lessor owned four town lots, contiguous. Each had a width of 40 feet and a depth of 150 feet. These lots fronted on Tennessee street, which ran parallel with the Mississippi river, and were bounded on the rear by the river. Mrs. Waite had two residences on these lots, fronting on and near to Tennessee street, and lived in one of them. The river bank was a high bluff of earthy material, known geologically as "loess." The height of this bluff above low-water mark was from 60 to 80 feet. Between the base of this bluff and the margin of the river at low water was a narrow "footing," along which the roadway mentioned in the lease was maintained. Whether this footing, as it is called by the witnesses, was natural, or the result of an artificial cutting away of the bluff, does not appear. Its material was identical with that of the bluff, and it was as subject to caving by action of a strong current, and was under water when the river was at a high stage. This footing was the only basis for a road giving access to the river, and constituted the landing referred to in the lease, there being no wharf, deck, or pier whatever. The landing had long before this lease been used as a place for mooring and unloading coal barges. The manner in which the unloading was done both before and after the lease is described by the witness C. B. Bryan as follows: "A long float was moored against the bank, on which the teams of C. B. Bryan & Co. were driven, and the barges or boats of coal were on the outside of said float, and the coal thrown from those boats or barges into the carts, driven on the float as before stated. Then the teams were driven off the float onto the roadway leading up from the river, and along and under the bank onto Beal street; thence up into the city. A lot of ground having a river front, belonging to the city of Memphis, which extended from the south of Linden street to Beal street, enabled C. B. Bryan & Co. to have a continuous way and outlet from the

float and barges moored in front of Mrs. Waite's property." Prior to May, 1886, this landing and roadway had been kept in proper repair, and in like condition to that in which it was at date of the lease. Although prior to that month there had been an occasional caving in of the roadway, it had not been serious, and the ravages of the river had been easily repaired. In the spring of 1886, and during the months of April and May, certain government works protecting Hopefield point, above and across the river, gave way, by reason of the force of the current and high stage of the river. The result was that an uncontrollable current was thrown directly against the river bank in front of Mrs. Waite's property, and the property contiguous to hers above and below.

This sudden and surprising change in the force and direction of the current of a swollen and mighty stream resulted in undermining the bluff, and causing it to fall down in great masses. So destructive was the force of the flood that when the river fell, and the current somewhat abated, nothing remained of complainant's property but a narrow and ragged fringe from 15 to 30 feet in depth. This remnant clinging to Tennessee street presented to the river an almost vertical bank from 60 to 80 feet above the ordinary stage of the river, its surface showing great cracks indicative of further caving. At its foot was deep water, against which a strong and almost resistless current was beating. Against this irregular bluff it was dangerous to moor water craft, both because further caving was plainly indicated, and because the force of the current was so great as to make it dangerous and impracticble. The evidence is convincing that it was impracticable to construct a footing at the base of the bluff for a new road. The remaining portion of complainant's property was not deep enough to permit the cutting away of the bluff in such manner as to protect a new road against the overhanging masses of the shattered bank. It was therefore impossible to reconstruct a practical and safe landing upon her water front; for, without access to and from the public streets of the city, barges could not be there loaded and unloaded. To moor, land, or unload became impossible when the landing referred to in the lease was destroyed, and the bluff's footing carried into the river. To lie under a bluff that was caving in great masses was perilous and practically impossible, in view of the great current sweeping against it. Under these circumstances the lessees treated the lease as terminated, and found a harbor and landing elsewhere. Certain works subsequently constructed in the river for the purpose of breaking the force of the current added to the unavailability of the lessor's remaining water front as either a mooring or landing place. These works consisted in a series of large cribs filled with rock, and sunken in lines perpendicular to the shore, and extending some 300 feet beyond low-water mark. One crib was sunken upon top of another, the crest of the line being at about high-water mark. Five of these dikes were constructed along the river front. The distance between each was about 300 feet. Until by accretion the water front of her shore property should be extended to the outer end of the dikes, access to the shore was so seriously obstructed by the presence of these sunken cribs of rock as to be substantially impossible for such crafts as laden coal barges. It has been contended that these dikes were constructed by the United State government as a part of its scheme of river and harbor improvement. We do not find this contention supported by the facts. It is true that some government material was used, and that the work was done under the plans and direction of Capt. S. S. Leech, of the engineer corps, and that the fleet and plant belonging to the government had been used in the prosecution of the work. The enterprise was, however, a private conception, and for the protection of private interests imperiled by the sudden change in the current of the river. The scheme was put on foot by a railroad company whose tracks occupied Tennessee street, which offered to subscribe $40,000 if private persons having interests likewise endangered would give half that amount. The emergency was a great one, and the secretary of war, under his discretionary powers, allowed Capt. Leech to supervise the work and use the government fleet and material in his charge. The enterprise was in all its essentials a private matter, for private purposes and benefits, and the fund used in doing the work was voluntarily contributed by those whose interests were benefited. That the complainant Mrs. Waite was one of those who actively aided and induced the

construction of these works is clear on this record. It is true that she feebly denies that she agreed to contribute to the fund, but admits she approved and encouraged the work. The weight of the evidence establishes that she not only approved and encouraged the scheme, but that she promised a large contribution, which she has since refused to pay. Upon these facts defendants insist that, if the lease was not terminated by the destruction of the landing through the action of the current of the river, they have been evicted as a necessary result of being excluded from the shore by obstructions in the river, placed there through the aid and consent of the lessor. Upon final hearing the circuit court sustained the jurisdiction, and held that the lease had not been terminated by the destruction of the landing or roadway mentioned in the lease, and that the lessees continued liable for rents accruing until the end of the term fixed by the lease, and gave judgment accordingly. That court further held that the covenants of the lease touching the repair of the roadway, and against waste, had not been breached, and refused all other relief prayed. Both parties have perfected appeals and assigned error.

Wm. M. Randolph & Sons, for Charlotte H. Waite et al.

Turley & Wright (Stephens, Lincoln & Smith, of counsel), for O'Neil & Co.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Nine years after this cause had stood at issue as an equity cause, and when being finally heard, the defendants objected to the jurisdiction of a court of equity upon the ground that the remedy at law was plain and adequate, and moved to have the pleadings recast and the cause transferred to the law docket. This motion was denied upon the ground that the case belonged to a class of cases where a court of equity might exercise jurisdiction; one object of the bill being to obtain the specific performance of an alleged covenant obligating the lessees to construct and keep in good repair a roadway along the river bank, and by which access to the landing might be had. Although the court refused a decree for specific performance, or damages in lieu thereof, it does not follow that jurisdiction did not exist to hear and decide the contention that complainant was entitled to that relief. The result reached was in large part a consequence of a construction of the covenants of the lease in the light of the peculiar character of the thing leased, and of the extraordinary cause which had destroyed the roadway and landing which it was sought to have reconstructed under the covenants in question. A case was stated on the face of the pleadings which fairly and reasonably appealed to a court of equity as affording ground for applying for the extraordinary, though discretionary, remedy of specific performance, and required evidence and a patient hearing before determination. Even though specific performance might be refused, yet the court might retain the case, and grant under the prayer for general relief some other relief, as at law. The principle applying was well stated by the learned trial judge when he said:

"If this bill be of that class often appearing, whether for specific performance or what not of other equitable appearance, in which a court of equity might

maintain and grant relief as at law, although denying the equitable relief which has been prayed for, the rule that the case would be dismissed because there was an adequate and complete remedy at law would not apply, unless it was taken at the earliest opportunity." 72 Fed. 354.

This rule, considered and applied by this court in Reynolds v. Watkins, 22 U. S. App. 83, 9 C. C. A. 273, and 60 Fed. 824, seems to be as applicable here as in that case. It is true that in that case, as well as in those upon which it is founded, the objection to the jurisdiction was first taken in the court of appeals, or in the supreme court. Still the principle applying is so far the same as to require objection to be taken seasonably, and if, for fault in that regard, the trial court refuse to entertain the motion, and the case be one of a class over which a court of equity may, under proper circumstances, entertain jurisdiction, this court will not be readily moved to disturb the action of the lower court. The discussion of this question found in the opinion of the learned trial judge is so full and satisfactory that we find no necessity of further elaboration. The objection to the jurisdiction must be overruled.

The contention of the complainant is that the lessees were bound to protect her property against the ravages of the Mississippi river, and to this end were bound, if necessary, to construct in the river such a system of mattresses and dike work as that which subsequently proved sufficient to prevent further encroachment and caving. They say that, for failure to do this before the flood came, they must now compensate the lessor for all the injuries wrought by the flood, or restore the property to the condition it was in when let, by specifically performing the obligation to keep the "roadway thereon" in repair, and the covenant which bound them to deliver the premises in "good order and repair," and "make good all damages to said premises, except the usual wear and proper use thereof." They further insist that defendants are liable for the covenanted rental to the end of the term. It is clear upon the proof that there is not enough left of complainant's property on which to construct and maintain a road. The grading necessary could not be done without cutting down Tennessee street. It is further made perfectly clear that no amount of mattressing and diking done in front of complainant's lots alone would have been of any avail. To protect her front from this sudden and uncontrollable current, it was essential that a comprehensive system of diking should be constructed, extending above and below her water front. Defendants had no right to occupy the riparian property of other abutters on the river, or obstruct access to their shore line by the works necessary to protect Mrs. Waite's property. Her front only extended along the river for a distance of 240 feet. The protective work deemed necessary to protect the shore line, including Mrs. Waite, covered the river front for a distance of 2,200 feet. Her landing and roadway had safely stood against the ordinary currents of the river for an indefinite time, and the bluff over the roadway had been unaffected, possibly for centuries. The usual abrasions of the shelf or footing along which the road ran had been easily repaired, and this roadway and landing,

confessedly in "good order and condition" when the lease was made, was preserved in like condition down to the sudden and unexpected change in the great current of the river resulting from the giving away of Hopefield point, on the Arkansas shore, and above Memphis. The restoration of her property is physically impossible, and the prayer for specific performance must be refused.

Is she entitled to an account for damages as for waste, or a judgment for rents accruing after the termination of the landing and roadway? Her claim for relief in one form or another, as well as for rent, is founded upon a construction of the covenants of the lease which we think cannot be supported. This lease appears to have been filled out on one of the usual blank forms sold by stationers for the leasing of lands and tenements, and contains the covenants proper to a common-law demise of improved premises. The covenants material to be considered are these:

(a) "And the said first party [the complainant] covenants that she will keep and secure said second parties in the peaceful use and possession of said premises during the time of this lease, unless default of payment of rent or other condition of this contract be made." (b) "The second parties [defendants], for and in consideration of the use of said premises, agree to pay said first party or her assigns the sum of $6,225, payable in 83 monthly installments." (c) "The second parties [defendants] agree to deliver up to said first party [complainant] or her assigns the said premises, at the expiration of this lease, in good order and condition, and to make good all damages to said premises, except the usual wear and proper use of the same, *and to keep the roadway thereon in good repair.*" (d) "It is further agreed by the parties of the second part that they will, if necessary, construct at their own expense a roadway of boats, piling, or plank along the river front of said lots, and to construct the same without unnecessary digging of the ground on said lots, and to maintain the same during the continuance of this lease. Said second parties stipulate not to commit, but to prevent, waste." (e) "It is further agreed that no alterations or repairs shall be done on any part of said premises by said second parties without the first party's consent in writing, under penalty of double the cost necessary to put the premises in the condition they were when leased to said second parties; and the second party shall not at any time remove any permanent repairs, improvements, additions, or fixtures put on said premises, but the first party shall have and hold all the same at the end of said lease. Said first party reserves the right to make such repairs at any time as are necessary to the security or preservation of said premises."

The line italicized in paragraph c and the whole of paragraph d were inserted by interlineation.

The construction of all grants, deeds, contracts, and leases must be made with reference to their subject-matter. As well observed by his honor, the trial judge, in the opinion filed in this case, "The court ought to take into consideration the circumstances attendant upon the transaction, the particular situation of the parties, and the state of the thing granted, and that every grant of a thing necessarily imports a grant of it as it actually exists, unless the contrary is provided for." In the case of Doe v. Burt, 1 Term R. 703, it was said by Ashurst, J., "that the construction of all deeds must be made with reference to their subject-matter, and it may be necessary to put a different construction on leases made in populous cities from those made in the country." This language was quoted and approved by the supreme judicial court of Massachusetts in Stockwell v. Hunter,

11 Metc. (Mass.) 448–456, where the lease under consideration was a demise of a cellar and basement in a house three stories in height, the court saying:

"The principle authorized a construction of leases of lower or upper rooms, demised separately, in reference to the termination or destruction of the interest, different from that usually applied to leases of entire buildings."

And although the court in that case reached the conclusion that the lessee of a room or apartment in a building in which there were other rooms or apartments did take an interest in the adjacent land on which the building stood, yet the circumstances were so peculiar as to justify the inference that "the lessee's right of occupation of the land is an interest, for the time being, defeasible by the destruction of the building by fire." In Winton v. Cornish, 5 Ohio, 477–479, the construction of a lease like that in Stockwell v. Hunter was under consideration. Touching the meaning and intent of the agreement, the court said that "what passes depends on the intention of the parties, to be collected from the lease"; that "by the term 'land' anything terrestrial may pass, but by any other term nothing else passes but what falls with the strictest propriety within the meaning of the term used." The lessee's interest in the land supporting the building was held to terminate when the building was destroyed. This lease was not an ordinary demise of land and tenements, but was a lease of "the river front and landing in front of lots numbers 1, 2, 3, and 4, block 1, South Memphis, with ample space for a roadway along the landing at all stages of the water, and no more." This included no tenement, wharf, dock, or pier, for no such improvement existed, or had ever existed. The use to which the thing or interest leased was to be put is stated and defined. It was "to be used by the lessees for mooring, storing, loading, and unloading coal, wood, and ice barges or boats." Clearly, Mrs. Waite did not demise her lots, or any other interest than her rights as a riparian proprietor. These leased rights were such as were appurtenant to her land on the shore, and would pass by a conveyance of those lots, as an appurtenance. Such an interest is not "land," in its full legal sense, because land cannot be appurtenant to land. Harris v. Elliot, 10 Pet. 25–54; East Haven v. Hemingway, 7 Conn. 202; Potomac Steamboat Co. v. Upper Potomac Steamboat Co., 109 U. S. 685, 3 Sup. Ct. 445, and 4 Sup. Ct. 15; Linthicum v. Ray, 9 Wall. 241. The rights of a riparian proprietor whose land is bounded by a navigable stream were defined in Yates v. Milwaukee, 10 Wall. 497–504, to be "access to the river from the front of his lot; the right to make a landing, wharf, or pier for his own use, or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those may be." In Lyon v. Fishmongers' Co., 1 App. Cas. 662, Lord Cairns describes such appurtenant riparian rights as "a form of enjoyment of the land, and of the river in connection with the land." In Potomac Steamboat Co. v. Upper Potomac Steamboat Co., cited heretofore, this interest is described as not a seisin of the submerged land between high and low water, but as "right of occupation merely, prop-

erly termed a 'franchise.'" 109 U. S. 685, 3 Sup. Ct. 445, and 4 Sup. Ct. 15.

The subject-matter of this lease was not Mrs. Waite's land, or any interest in it other than that riparian right, franchise, or enjoyment which was appurtenant to her lots, and would pass by a deed conveying them. The "ample space for a roadway," "and no more," mentioned in the second paragraph of the lease, is further specifically designated in the next paragraph as the "roadway thereon," and this "roadway thereon" the lessees undertook to keep in repair. This roadway was below high water, at base of the bluff, and was a mere incident to the right of mooring and loading and unloading. It was the means of access to the landing or river; a way of necessity, without which the essential thing granted could not be enjoyed. The right to occupy or use this "road thereon," either as a means of access to or egress from the "landing," though an interest or right in land, was a mere right of use and occupation, defeasible by the destruction of the landing to which it was an incident. Construing the covenants in the light of the peculiar property demised as the thing granted actually existed. it is not possible that the parties intended that the lessees should undertake the protection of Mrs. Waite's land on shore against the extraordinary perils from a sudden change of the currents of the Mississippi river, nor was any such peril within the reasonable expectation of the parties. This bluffy bank had stood in substantially the same condition for centuries. Its base was subject to such abrasion as was usual from high stages of the river, and to the extent that such ordinary tides might be guarded against, or its ravages repaired, the covenants may properly be held to apply. The event which operated to throw down the bluff and destroy her shore line as a landing, and cut off access to the river by the roadway at the base of the bluff, was one of those fortuitous calamities which it is unreasonable to suppose was within the meaning of covenants appropriate to leases wherein lands and tenements are the subject of the demise. We are therefore in entire agreement with the learned trial judge in holding that "the parties did not intend anything more than that the lessees should keep the landing in such repair and condition of usefulness as was required for the uses to which they were to put it, and as then held, as against the ordinary destructive influences operating to abrade the bank or displace the appliances serving that use." That no such extraordinary works were to be constructed by the lessees as were ultimately found necessary to hold what remained of her shore line is not only evident from the intrinsic nature of the case, but is indicated by the provision of the lease prohibiting alterations or repairs to the premises without the consent in writing of the lessor, and by the right reserved to the lessor to make such repairs as should be necessary "to the security or preservation of the premises." As we have already seen, the mattressing and diking done to protect the fragment of her shore line effectually destroyed access to the shore during the remainder of the term. It could not be expected that the beneficial use of the landing should be destroyed in order to guard it against caving, and if such protective works had been con-

structed by the lessees it is easy to conceive that the lessor would have sought to hold the lessees liable upon the covenant against waste, for having destroyed her landing and harbor by works which for many years were likely to make access to it perilous and impracticable.

Upon the remaining point for decision we find ourselves unable to agree with the trial court, which held that the covenant to pay rent was not extinguished by the destruction of the property. In support of this position the opinion cites Tayl. Landl. & Ten. §§ 329, 347, 360, 373, 386; 3 Kent, Comm. 465; Belfour v. Weston, 1 Term R. 310; Ellis v. Sandham, Id. 705; Hallett v. Wylie, 3 Johns. 44; Fowler v. Bott, 6 Mass. 63; and the observation of Mr. Justice Gray as to the distinction between the rule of the civil and common law in Viterbo v. Friedlander, 120 U. S. 707–712, 7 Sup. Ct. 962. It will be found upon examination that these authorities correctly state the rule of the common law where lands are the subject of the demise, and the buildings or improvements are accidentally destroyed before the term ends. In such cases the destruction of buildings by fire, tempest, or flood does not discharge the covenant to pay rent, in the absence of a stipulation to that effect. The reason for this severe rule is that the land is deemed the subject of the demise, and the buildings a mere incident. If the land remained to the tenant after the buildings were destroyed, and he had a right to occupy and use it, his liability for rent, without abatement, was held to continue. To the authorities cited by the learned trial judge we may add Banks v. White, 1 Sneed, 613, a Tennessee case, in which the common-law rule was held applicable to such leases. In view of the fact that rent is a compensation for the use of the thing demised, it has been regarded as a harsh rule, and contrary to natural justice, that liability for rent should continue after the possibility of beneficial use had been destroyed by accident, and at an early day some of the judges struggled against its severity. Richards le Taverner's Case, 1 Dyer, 56. These early efforts to mitigate it were unavailing, and the rule was finally settled as stated. Gates v. Green, 4 Paige, Ch. 355; Fowler v. Bott, 6 Mass. 63. But the very foundation upon which the old rule was rested is removed if the subject-matter of the demise is destroyed. This exception is noticed by Justice Gray in his statement of the common-law rule in Viterbo v. Friedlander, when he adds, "unless at least the injury is such a destruction of the land as to amount to an eviction." Where the subject-matter of the lease is a room or an apartment in a building, and the building is destroyed, the lease is terminated, the interest of the tenant is at an end, and the covenant to pay rent extinguished. This rule is bottomed upon the fact that under such leases it is to be presumed that the interest of the tenant in the subjacent land was to continue only so long as the subject-matter of the lease existed. This doctrine is well settled, and is clearly stated by Mr. Taylor in his admirable work upon Landlord and Tenant, at section 520. As stated by him, it has never been repudiated or questioned in cases where it was applicable, so far as our researches have extended, and has been applied in many well-reasoned cases; among them, we cite

Winton v. Cornish, 5 Ohio, 477; Kerr v. Merchants' Exchange, 3 Edw. Ch. 315; Stockwell v. Hunter, 11 Metc. (Mass.) 448; McMillan v. Solomon, 42 Ala. 356; Graves v. Berdan, 26 N. Y. 498. In the case at bar we have already determined that the subject-matter of this lease was the landing, as it existed at date of lease. A "landing" implies a place where vessels can be moored and loaded or discharged. This landing was effectually destroyed by the ravages of the river. If the effect of the force of the current had been limited to merely moving the shore line back, and the new shore line had been substantially as useful as the old, it might well be held that the leasehold continued in existence. But this was not the case. The bank of the river, as it existed after the caving had been arrested, was a vertical bluff, from 60 to 80 feet high. Against this a vessel could not be moored, and her cargo could not be discharged. The physical aspects of the river bank had been so changed, as a consequence of the uncontrollable current of the river, that, although complainant continued to be a riparian proprietor, she no longer had a "landing," in the sense in which the parties had used that term, nor was it possible by reasonable effort to make a landing. The shallow fragment of her lot clinging to Tennessee street was insufficient in depth to permit the construction of a landing and roadway at its base. Aside from this, the construction of mattresses and dikes in front of her shore line effectually destroyed safe access to her shore line from the navigable parts of the stream. It is true that she reserved the right to make such "repairs" as should be "necessary to the security and preservation of the premises." But this did not authorize the construction of works which would make the use of the landing perilous and useless to her lessees. The diking which was done was done with her consent, and legally by and through her procurement, in co-operation with others. This improvement operated to destroy the landing, if it can be said to have had an existence after the caving of her bank had been arrested. In a legal sense, her conduct amounted to an eviction. When the wrongful acts of a lessor upon or in regard to the leased premises are such as to deprive the lessee of the beneficial enjoyment of them, and the lessee in consequence abandons the premises, it amounts in law to an eviction, without other evidence that the landlord intended to deprive the tenant of the possession. Skally v. Shute, 132 Mass. 367. Where repairs are not ordinary, but of a character to deprive the tenant of the beneficial enjoyment of the premises, they will amount to an eviction, if the tenant elects to abandon the premises. Hoeveler v. Fleming, 91 Pa. St. 322. The defendants did not assent to the so-called "repairs." They foresaw that the effect would be to exclude them from the beneficial use of the river front, and made unavailing protest in order to save their rights. The decree must be affirmed in so far as it refused a decree for waste or specific performance, and reversed in so far as it held defendants liable for rents. The costs of both courts will be paid by complainants.