MATTHEW J. KANE, Chief Justice.
JOHN B. TURNER, Vice Chief Justice
R. H. LOOFBOURROW,
FINIS E. RIDDLE,    } Justices.
W. R. BLEAKMORE,

### NEW STATE BREWING ASS'N v. MILLER.

No. 3371.   Opinion Filed July 14, 1914.

(141 Pac. 1175.)

1.   **LANDLORD AND TENANT** — "Constructive Eviction" — What
Constitutes. If a tenant is deprived by the wrongful act of the
landlord of the beneficial use of the premises and is compelled
thereby to quit and abandon them, it amounts to a constructive
eviction, and actual force is not necessary to constitute such evic-
tion.

2.   SAME—Question for Jury. Whether there has been a construc-
tive eviction depends upon the facts and circumstances of each
particular case, and is a question of fact for the determination
of the jury.

3.   SAME—Eviction—Existence. The propositions that there can be
retention of demised premises and an eviction are logically and
legally contradictory.

4.    APPEAL AND ERROR—Landlord and Tenant—Reversal—Eviction—Sufficiency of Evidence—Amount of Recovery—Instruction. Record examined, and held: (1) That there was sufficient evidence to take the case to the jury on the question of constructive eviction; (2) that the evidence was not sufficient to sustain the amount of recovery allowed by the jury; (3) that the giving of instruction No. 7, allowing treble damages if the jury found the acts of the defendant amounted to forcible eviction, which is admittedly erroneous, probably resulted in a miscarriage of justice, for which the cause should be reversed and remanded for a new trial.

(Syllabus by the Court.)

*Error from Superior Court, Oklahoma County;*
*E. D. Oldfield, Judge.*

Action by Guy Miller against the New State Brewing Association. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*Ames, Chambers, Lowe & Richardson,* for plaintiff in error.

*G. A. Paul, C. J. Eacock,* and *A. N. Munden,* for defendant in error.

KANE, C. J.  This was an action in tort, commenced by the defendant in error, plaintiff below, against the plaintiff in error, defendant below, to recover damages alleged to have been sustained by the plaintiff by reason of the wrongful acts of the defendant in evicting him from certain premises leased by him from the defendant. Upon trial to the jury, there was a verdict for the plaintiff in the sum of $15,000, upon which judgment was duly entered, to reverse which this proceeding in error was commenced.

As the jury found in favor of the plaintiff, it will be necessary to consider all questions of fact as settled in his favor, in so far as there was evidence reasonably tending to sustain them. It seems that on or about the 22d of March, 1908, the plaintiff and defendant entered into an oral lease or contract, whereby the plaintiff leased and rented of and from said defendant a certain room known as the "hoproom" for cold storage purposes, and agreed to pay therefor the sum of $75 per month for the egg season, which covers the period from April 1st to January 1st

of each year.   In addition to the ordinary leasehold covenants, the contract entered into provided that the plaintiff should be furnished with refrigeration, elevator service, and warehouse receipts for the merchandise stored upon said premises.   The general purpose for which said room was rented, which was well known to the defendant, was for the storage of eggs.   Said plaintiff was in the general produce business, and bought and sold upon the market large quantities of eggs; that in pursuance of his general business it was his practice to purchase large quantities of April and May eggs for sale upon the fall and winter market, the season for this class of business being between the 1st days of April and January, respectively.   The storage capacity of the hoproom was 5,000 cases.   It was also provided by the terms of said oral contract that the plaintiff might occasionally store butter and poultry in said hoproom.   It seems that between the date of the oral contract aforesaid and the 1st day of April, the date it was to become effective, there was a change of the presidency of said defendant company, and immediately upon the new president being installed he insisted that the plaintiff should enter into a written lease of the premises.   The written contract presented was not satisfactory to the plaintiff, and upon his refusal to sign the same, a dispute arose between the plaintiff and the new president which culminated in the plaintiff disposing of upon the market all the eggs purchased in pursuance of his business and in abandoning the premises on or about the 1st day of the following June.

The specific acts which constitute the alleged eviction, as stated by the plaintiff, are in effect as follows:

"The lease became effective on the 1st day of April.   On that date Mr. Glitsch became the manager, having succeeded Mr. Thompson, who acted for the company, in the execution of the lease.   On the 3d day of April, I requested Mr. Glitsch to furnish warehouse receipts.   I used warehouse receipts on which to get money from the bank.   Mr. Glitsch did not want to issue warehouse receipts, and said that he did not know what was stored there; that he made no contract with him.   Glitsch refused to issue any warehouse receipts.   He was apparently angry. ·When I told him that I would not go to the south side

to store my eggs, he submitted to me another contract. I told him that I had a contract that was satisfactory to me. He said that he had been trying to get all contracts in writing. I said that if the written contract was as the original contract and suited me, I would sign it. In three or four days after that he asked me to sign this written contract, about April 6th. I again asked Mr. Glitsch to issue warehouse receipts, and he said he could not issue them. He said that I had no contract for that storeroom. I then told him I would sign the written contract except for the fact that it did not give me the right to store any butter or poultry in the room. We had a conversation about it almost every day. I told him positively that I would not sign the contract unless he would cut out that clause which said I could store only eggs, and could not store anything else there but eggs, for the simple reason that during the poultry season I would want to put in some few turkeys and dressed poultry. He said I must sign that contract or he would cut off the refrigeration. That was early in April. Messrs. Clark and Trupshaw, officers of the company, were present at the time this conversation took place. Mr. Trupshaw said that I had always been a valued customer, and that he did not want any trouble, and that he wanted things fixed up so there would not be any trouble. He also told me to go ahead and sign the contract, and then a little later on, if I wanted to put in some butter or poultry and would ask Mr. Glitsch about it, he would allow it. I told Mr. Trupshaw that my relations with Mr. Glitsch during the past two weeks had been anything but pleasant, and that I wanted no more dealings with him than were necessary, and that I could not depend on what he would say, and that I could not sign the contract on that account. I told him, however, that if Mr. Clark would agree to that I would sign it, for I knew that I could count and depend on what he would say. With that Mr. Glitsch lit into me and said he would cut off the refrigeration, and that I would have to get out, and that he would put me out of business. The next day he called me up over the phone and said that I was no business man not to take the word of a reliable association; that I had to get out of that storeroom or he would cut off the refrigeration. A day or two later I received a letter from him as follows:

" 'Oklahoma City, Okla., April 14. 1908.

" 'Guy Miller Produce Co., Gentlemen:   You are hereby requested to return to us the copy of the contract sent to you for your signature, as you have stated that the same was not satisfactory to you. We now decline to enter into the contract

as originally proposed and you are hereby respectfully noti-
fied to vacate the hoproom in the Brewery Building and Room
No. 11 in the cold storage department, May 1st, 1908, as we
shall discontinue the refrigeration on the Brewery Building and
desire vault No. 11 for general storage.

" 'Very respectfully,
" 'New State Brewing Association,
" 'By Carl S. Glitsch, Mgr.'

"I returned the contract, as requested, but did not go to,
see Mr. Glitsch for a day or two. In previous years duplicate
keys to these rooms were issued, and I retained one and went
into the storage room whenever 1 desired. Mr. Glitsch gave
me a key to this room; it was kept in the cupboard in the dy-
namo room, and I had to go there to get it. The key was finally
removed from there. The boys would then have to go over to
the south side about a block and find the storage man and get
him to come and let them in and check in the eggs. I com-
plained to Mr. Glitsch about that, telling him that I had a contract
for that room, and that we could not run about for two hours
every time we wanted to get into it to get the storage man to
let us in. He replied that I had no contract, and they would
have to check in and check out the eggs just as though they
were charging that way; that the only contract I had was to
pay $75 per month, and that was a monthly contract. I did not
take any eggs out of the room during the first month, but put
some in as I got them. Every time I would put in any eggs
I would ask for warehouse receipts, and would ask Mr. Glitsch
if he was going to issue them. It had been customary during
the years that I had been there previous to this, and in con-
versation with Mr. Clark he told me that warehouse receipts
would be issued to me as in previous years. This was on the
27th day of March, 1908. After I refused to sign the written
contract, Mr. Glitsch said he had thought the matter over, and
he was going to make me get out. We would often have a
load of stuff there and could not get elevator service and would
have to carry it up the stairs to the storage room. Up until the
time the notice was served on me, I put absolutely nothing in
the room except eggs. On the 30th day of April, 1908, I put
into the room 65 pounds of dressed poultry in a flour barrel
headed up. This was the first and only time I put anything
but eggs in that room, and I kept it there only three or four
days. I continued the use of the room during the month of
April, and on the first day of May I tendered to the New State
Brewing Association a check for the rent for the month of May.

It was not accepted then, but was subsequently.   About the 6th day of May I received a notice to vacate, as follows:

" 'You are hereby notified to leave the following described premises now occupied by you as an egg cold storage room, to wit: one egg cold storage room situated in the Brewery Building located on block nine of the city of Oklahoma City, said room being known as the hoproom, and unless you vacate said room and deliver over the possession thereof to the undersigned within three days, an action will be brought for the recovery of the possession of such room.

" 'The ground upon which the recovery of this room will be sought is that whereas you have a contract for the use of the same as an egg cold storage room exclusively, you are in fact and in violation of said contract using the same and threatening to continue the use thereof for other commodities.'

"After receiving the above notice, I consulted an attorney and on May 7, 1908, brought a suit in the district court, seeking to enjoin the association from interfering with my possession of said room.   The court made an order requiring notice of the application for the injunction to be served upon the defendant and setting the next day, May 8, 1908, for the hearing of the application for a temporary injunction, and in the meantime issued its restraining order restraining the defendant from interfering with my possession of the room.   On May 11, 1908, in open court the application for temporary injunction was heard and denied.   After that I called up Mr. Glitsch and asked him to issue me some warehouse receipts, and he refused to issue them.   He said I had no contract, and that I had to get out of the room.   I remained in the room until the 30th day of May, 1908, and I paid the rent on the 14th day of May for the month of May.   I rented the room for the storage of butter, eggs, poultry and produce."

In answer to the question, "Why did you get out of the room?" the defendant in error replied:   "Absolutely put out of business by the New State Brewing Association; they ruined my business by not allowing me to keep my eggs in there, and I could not do anything else but get out."

Plaintiff in error contends:   (1) That the verdict is contrary to the law and the evidence, for the reason that the evidence adduced upon the trial is not sufficient to establish the charge of unlawful eviction upon which the plaintiff relies for recovery;

(2) that the verdict is excessive; (3) the court erred in admitting incompetent, irrelevant, and immaterial evidence; (4) the court erred in giving to the jury certain instructions, to which exceptions were saved by the defendant. On the other hand, the defendant in error contends that there is ample evidence tending to show the malicious purpose of the plaintiff in error in attempting to deprive him of the use and enjoyment of the premises; that an eviction is not necessarily an actual, forcible taking possession of the demised premises by the landlord, nor does it necessarily consist in the expulsion of the tenant or a physical interference with the demised premises, nor need it be attended with a denial or refusal to permit the tenant longer to occupy the premises under the lease. Any intentional and injurious interference by the landlord which deprives the tenant of the means or the power of beneficial enjoyment of the demised premises or any part thereof, or materially impairs such beneficial enjoyment, is a constructive eviction. *Waite v. O'Neil et al.,* 76 Fed. 408, 22 C. C. A. 248, 34 L. R. A. 550; *Royce v. Guggenheim,* 106 Mass. 201, 8 Am. Rep. 322; *Coulter v. Norton,* 100 Mich. 389, 59 N. W. 163, 43 Am. St. Rep. 446; *Witte v. Quinn,* 38 Mo. App. 681; *O'Neill v. Manget,* 44 Mo. App. 279; *Scott v. Simons,* 54 N. H. 426; *Tallman v. Murphy,* 120 N. Y. 345, 24 N. E. 716; *Hoeveler v. Fleming,* 91 Pa. 322. Eviction in its original technical meaning consists of some change in the possession of the party by the disturbance of an actual or constructive possession, which has been displaced by a paramount title to which the party has been compelled by law, or by satisfactory proof of genuineness, to submit. 16 Cyc. 820; *Matteson v. Vaughn,* 38 Mich. 373; *Brickhead v. Cummins,* 33 N. J. Law, 44. And a constructive eviction is caused by the inability of the purchaser to obtain possession by reason of the paramount title. *Brass v. Vandecar,* 70 Neb. 35, 96 N. W. 1035. As used at the present time, the word is extremely difficult to define with technical accuracy, since it is used to denote that which formerly it was not intended to express. But eliminating the old notion of an eviction, it may now be taken to mean, not a mere trespass, and nothing more, but something of a grave and permanent character done by the land-

lord with the intention of depriving the tenant of the enjoyment of the demised premises. 16 Cyc. 821.

It is well settled that whether there has been a constructive eviction depends upon the facts and circumstances of each particular case, and is a question of fact for the determination of the jury. *Rice v. Dudley,* 65 Ala. 68; *Warren v. Wagner,* 75 Ala. 188, 51 Am. Rep. 446; *Hayner v. Smith,* 63 Ill. 430, 14 Am. Rep. 124; *Lynch v. Baldwin,* 69 Ill. 210; *Talbott v. English,* 156 Ind. 299, 59 N. E. 857; *Hall v. Irvin,* 78 App. Div. 107, 79 N. Y. Supp. 614. Under the liberal rule in this jurisdiction, we think there was sufficient evidence to take the case to the jury on the question of constructive eviction. Granting, however, that there was evidence reasonably tending to show a constructive eviction, the eviction did not occur until the 1st day of June, 1908, the date the plaintiff surrendered possession of the leased premises.

As was said in *Mortimer v. Brunner,* 19 N. Y. Super. Ct. (6 Bosw.) 653:

"The propositions that there can be retention of demised premises and an eviction are logically and legally contradictory."

In another New York case (*Boree v. Lawton,* 90 N. Y. 293, 43 Am. Rep. 170), the Court of Appeals said:

"But we know of no case sustaining the doctrine that there can be a constructive eviction, without a surrender of the possession. It would be manifestly unjust to permit the tenant to remain in possession, and, when sued for the rent, to sustain the plea of eviction by proof that there were circumstances which would have justified him in leaving the premises."

The plaintiff was engaged in the general business of buying and selling eggs at wholesale for profit, and as an adjunct of said business, it was his purpose to purchase and store 5,000 cases of April and May eggs for sale upon the fall and winter market. As we understand his contention, he claims no damages for any injury to his general business. According to his theory, his entire damages accrued on account of being compelled to sell on the current market the 5,000 cases of April and May eggs purchased and stored for sale on the fall and winter market; and that the measure of his damages is the difference between the market

price of these cold storage eggs at the time he was compelled to sell and the market price during the fall and winter market. We have carefully examined the record, and are unable to find sufficient evidence to sustain a verdict for the amount of recovery allowed by the jury upon that theory. The evidence adduced at the trial tends to show that the plaintiff carried on his general business of buying and selling eggs upon the current market, from the time the lease went into effect to the day the premises were vacated, in the usual and ordinary course of his business. But the evidence adduced does not separate this storage business from the general business with sufficient definiteness to enable the court to determine just how many cases of April and May eggs were purchased for storage, or how many cases of that class of eggs were on hand at any particular time, or how many were on hand on the date the premises were surrendered, or a few days prior or subsequent to that date. As the time for purchasing April and May eggs had expired at the time the premises were surrendered, all of the purchases that were to be made for storage must have been made, and it could have been shown with absolute definiteness the number of cases purchased for storage, when they were purchased, when stored, and the date of the sale. In view of the indefiniteness of the evidence on these points, it is quite clear to the court that the jury must have been misled by instruction No. 7, requested by the plaintiff and given by the court, as follows:

"If you find and believe that the acts of the defendant complained of by the plaintiff amount to forcible eviction of the premises, as defined in the instruction, you will then find in an amount equal to three times such sum as would reasonably compensate him for the loss suffered by reason of the acts complained."

This instruction is admittedly erroneous, and in our judgment the giving of it resulted in a miscarriage of justice. Section 6005, Rev. Laws 1910.

It is obvious that counsel and the trial court were of the opinion that section 2882, Rev. Laws 1910, which provides for the recovery of treble damages in case of forcible eviction from real property was applicable to the facts adduced at the trial. This theory, however, has been abandoned in this court, and

counsel for plaintiff now admit that the facts found by the jury constitute merely a constructive eviction. They contend, however, that, there being evidence in the record reasonably tending to support the verdict returned, even on the theory of constructive eviction, this court ought not disturb the judgment of the court below. From what we have already said, it is clear that the court does not concur in this conclusion. In our opinion, there is not sufficient evidence to sustain the amount of recovery upon the theory the case was submitted to the jury, without allowing the treble damages provided for by the statute.

There are other questions presented for review by counsel for plaintiff in error; but, as all the parties now agree that this is an action for damages for a constructive eviction, and not an action for damages for breach of contract, nor for forcible eviction from real property for which treble damages may be recovered, the issues on retrial will be comparatively simple, thus making further discussion of the questions presented unnecessary at this time.

For the reasons stated, the judgment of the court below is reversed and remanded, with directions to the court below to grant a new trial.

All the Justices concur.